### In re GREEN et al.
No. 25483.   Sept, 17, 1935.

James B. Diggs (Joseph C. Stone and William C. Liedtke, of counsel), for respondents M. E. Turner, K. B. Turner, and Harry B. Parris.

Hall & Thompson, for respondent T. A. Chandler.

E. R. Jones and Frank G. Anderson, for State Bar of Oklahoma.

OSBORN, V. C. J. This is a proceeding to review a recommendation of the Board of Governors that respondents Hazen Green and T. A. Chandler be disbarred from the practice of law, and that respondents K. B. Turner, M. E. Turner, Jack Harley, Otho Green, and Harry B. Parris be suspended from the practice of law for certain designated periods.

The acts and conduct of respondents which resulted in the accusation occurred during the years 1923 and 1924. At that time K. B. Turner, M. E. Turner, Jack Harley, and Harry B. Parris were engaged in the practice of law at Eufaula in McIntosh county, under the firm name of Turner, Turner, Harley & Parris. Hazen Green is the father of Otho Green and they were also engaged in the practice of law at Eufaula under the firm name of Green & Green. T. A. Chandler is a member of the bar and for many years lived in Vinita, Craig county.

The unprofessional conduct which is made the basis of the accusation against all of the respondents is in connection with the obtaining of a divorce and property settlement for one Exie Fife. She was a new-born full-blood Creek citizen and as such received an allotment of land in Creek county. In 1921 or early in 1922, oil in large quantities was discovered on her allotment. In October, 1922, she married a white man named Berlin Jackson. (The record shows a marriage subsequent to this marriage, but for the sake of convenience she will be hereinafter referred to as Exie Fife.) Some time after the first six months of her married life domestic difficulties arose. She employed the firm of Green & Green to procure a divorce, and they filed suit for divorce in the district court of McIntosh county. Her husband, Berlin Jackson, retained the firm of Turner, Turner, Harley & Parris to represent him in the divorce action. Evidence was introduced and the Board of Governors found that an agreement was made between Exie Fife and her husband that she would pay to him the sum of $10,000 as a property settlement. Respondents contend that the evidence is not sufficient to justify this conclusion.

It appears that prior to the rendition of the divorce decree, Exie Fife had been intimately associating with one Ollie Carr. An arrangement was made with W. M. Carr and Ollie Carr, his son, by the firm of Turner, Turner, Harley & Parris that they would pay out of their fee to Carr and son the sum of $5,000 if the said Ollie Carr would exercise certain influence he had to procure the signature of Exie Fife to a contract of settlement giving $35,000 to Berlin Jackson. At that time it was contemplated that the $35,000 would be divided as follows: $5,000 to W. M. Carr for himself and his son, $15,000 to Turner, Turner, Harley & Parris for their fee, and $15,000 to Berlin Jackson. Pursuant to said agreement Ollie Carr talked to Exie Fife and secured her signature to the $35,000 contract of settlement. The contract was also signed by Berlin Jackson.

At this time it is shown that Exie Fife had accumulated as oil royalties with the Department of the Interior the sum of approximately $160,000; that said funds were restricted and could not be paid out except upon approval of Shade Wallen, then Superintendent of the Five Civilized Tribes, whose office was at Muskogee. After the signing of the $35,000 contract, all of the interested parties met in Muskogee for the purpose of presenting the contract to the Superintendent of the Five Civilized Tribes for his approval. Prior to this time the firm of Green & Green had employed the respondent T. A. Chandler to assist them in representing Exie Fife for the reason that he was experienced in handling affairs through the office of the Superintendent of the Five Civilized Tribes, and he was also present at the meeting at Muskogee. The Board of Governors concluded that the real reason for the employment of Chandler was that he had a strong influence with Shade Wallen, the Superintendent, by reason of personal and political friendship. At this meeting the attorneys for Exie Fife insisted that their fee should be the same as that of attorneys for Berlin Jackson, and Exie Fife agreed to the payment of such

462

fee. In view of such agreement it became necessary to rewrite the contract. The contract was rewritten, and the sum of $50,000 was substituted therein for the sum of $35,000, and the contract was then signed by Berlin Jackson and Exie Fife.

After a further conference it was decided not to submit the contract directly to Wallen, but it was delivered to A. J. Ward, national attorney for the Creek Indians. On September 6, 1923, Ward transmitted the contract to Wallen with a letter recommending its approval, and thereafter Wallen approved the contract. By the terms of the contract it appeared that the sum of $50,000 was to be paid to Berlin Jackson in full settlement of all his claims against the estate of Exie Fife, and also provided that she should not be liable for his attorneys' fees and that the fees of her attorneys should be set by the Department of the Interior and paid by them. The divorce was granted January 9, 1924, and one C. J. Hunt, from the office of the Superintendent of the Five Civilized Tribes, delivered three checks to the parties on the same day. One of the checks was for $50,000 and two were for $250 each. The checks were made payable to Exie Jackson and were endorsed by her. The $50,000 check was delivered to Berlin Jackson and one of the smaller checks was delivered to Hazen Green and the other to T. A. Chandler. Berlin Jackson delivered the check to his attorney, K. B. Turner, and they went together to the Oklahoma State Bank at Eufaula for the purpose of making a distribution of the proceeds of the check. The Board of Governors found that out of the $50,000, Turner, Turner, Harley and Parris received $20,000; Green & Green received $6,500 and T. A. Chandler $8,500; that Turner, Turner, Harley & Parris paid $5,000 to W. M. Carr for himself and his son, Ollie Carr. It further appears that one N. E. Storey, a brother-in law of Berlin Jackson, was paid $1,000 out of the fees received by Turner, Turner, Harley & Parris. The Board of Governors concluded that this $1,000 represented compensation paid by said law firm to Storey for using his influence to keep Berlin Jackson in line and under the influence of said law firm during the pendency of the settlement.

After the divorce was granted the respondents Hazen Green and T. A. Chandler cashed the $250 checks given them as attorneys' fees and by virtue of a prior agreement repaid the cash to Exie Fife.

It appears that the facts surrounding the so-called property settlement thereafter became the subject of an inquiry by the United States Government and resulted in a grand jury indictment being returned against all of the respondents herein named. They were indicted for a conspiracy to defraud the United States with respect to the exercise of its governmental functions in regulating, supervising, administering, and controlling monies in custody of the Superintendent of the Five Civilized Tribes. Respondents were tried in the Federal Court for the Eastern District of Oklahoma on said indictment and were convicted. The cause was appealed to the Circuit Court of Appeals for the 10th Circuit and there affirmed. Green v. United States, 28 Fed. (2d) 965. When the cause was remanded to the Federal District Court, fines in various amounts were assessed against respondents and were paid. A civil proceeding was instituted by the United States Government and resulted in M. E. Turner and K. B. Turner repaying to the United States Government all the money which the government claimed was unjustly received by them, amounting to something over $20,000.

On December 21, 1930, the Board of Governors of the State Bar filed an accusation against the respondents herein alleging that they had been convicted on April 1, 1927, in the United States District Court for the Eastern District of Oklahoma of a felony, thereby subjecting themselves to suspension and disbarment. A hearing was had on said accusation and the board made recommendations for the disbarment of M. E. Turner, K. B. Turner, Jack G. Harley, Hazen Green, and T. A. Chandler, and reserving for further disposition the case against Otho Green and H. B. Parris.

On October 1, 1932, this court rendered an opinion, In re Green, 161 Okla. 1, 16 P. (2d) 582, in which it was pointed out that a mere conviction of a felony does not make it mandatory on this court to disbar an attorney on the ground of such conviction; that this court will examine all the facts and circumstances in reference to such conviction in determining whether such attorney should be suspended or disbarred under the provisions of section 4106, C. O. S. 1921. The cause was remanded to the State Bar for further proceedings and recommendations.

Thereafter and on June 5, 1933, an amended accusation was filed which alleged the conviction hereinabove referred to and alleged the guilt of respondents of the crime for which they were convicted. The charge is that said crime involves moral turpitude; that all respondents have lost their private and professional standing and have ceased to possess good moral characters, prerequisite to the practice of law, and are unfit, unsafe,

and untrustworthy persons to be entrusted with the powers and duties and responsibilities of attorneys and counselors at law.

Other and further evidence was introduced and extensive findings of fact and conclusions of law were made by the Board of Governors, including recommendations for the disbarment of Hazen Green, and T. A. Chandler for the suspension of K. B. Turner, M. E. Turner, and Jack G. Harley for a period of six months, and for the suspension of Otho Green and H. B. Parris for a period of 30 days.

It is at once apparent that the above transactions reveal in more than one instance the performance of such acts and conduct on the part of the several respondents as to bring reproach and disrepute upon the bar of this state, and thereby to challenge the attention of this court through the disciplinary agency of the State Bar. Into this category falls the fee splitting arrangement made between the firm of Turner, Turner, Harley & Parris with W. M. Carr and Ollie Carr. This transaction constitutes an inexcusable breach of professional ethics and an attempt to abort justice. In consideration of the fact that the influence purchased by the firm for a cash consideration arose through a clandestine love affair between their hireling and the victim of their exploitation there is revealed a disregard of the high duties and functions of an attorney at the bar on the part of those engaged in such transaction which calls for prompt and vigorous condemnation. Such conduct is reprehensible and cannot and will not be condoned or excused by this court.

This likewise applies to the payment of $1,000 to N. E. Storey. The evidence of respondents as to the purpose of such reward is entirely unsatisfactory. The conclusion of the Board of Governors that Storey was rewarded for keeping Berlin Jackson in line with the wishes of Turner, Turner, Harley & Parris is the more logical and reasonable. The splitting of fees for such purpose is likewise inexcusable and reprehensible and cannot be justified or condoned.

In connection with the conviction of respondents in the United States District Court for conspiracy to deceive the United States Government, respondents lay considerable stress upon the testimony of Hon. R. L. Williams, Federal Judge, who presided at the trial of said cause and thereafter fixed the punishment against each of the respondents. In this connection Judge Williams testified that he had not seen fit to disbar any of the respondents from practice in the federal court for the reason that he did not consider that the offenses for which they were convicted involved moral turpitude. He further testified that he considered the offense to be a technical one, and that he did not think that any of the respondents thought that they were violating the law when they presented the contract for approval and that he was not so sure that the superintendent was deceived, although the jury found otherwise. Further evidence was introduced to show that the Superintendent of the Five Civilized Tribes had full information prior to his approval of the contract as to how the proceeds were to be distributed. While these considerations would bear great weight in determining the guilt of respondents of a criminal offense, they are less weighty in determining a charge of improper conduct as members of the bar. The fact that the superintendent was a party to the transaction would not justify the conduct of respondents in preparing a contract which purported to secure funds in the custody and control of the Department of the Interior as a settlement of property rights when it was their intention at the outset to apply the major portion of said funds to their own use and benefit as attorneys' fees. The contract specifically provided that Exie Fife should not be responsible for attorneys' fees for Berlin Jackson and that the fees for her attorneys should be fixed by the Department, and at the time the contract was prepared it had been agreed that out of the $50,000 involved therein the attorneys would receive $30,000, and $5,000 was to be the reward paid to W. M. Carr and Ollie Carr for the exercise of their influence upon Exie Fife to secure a more favorable settlement. Had the contract been prepared to show the actual agreement as to the distribution of the funds, it is readily apparent that it could not have been approved under any circumstances. It was therefore necessary, in order to carry out the corrupt design and purpose of the respondents, that concealment be practiced upon the agencies of the government having custody and control of the funds. If there was a secret understanding between the parties and the superintendent as to the manner in which the funds should be distributed, such fact would not tend to relieve respondents of any degree of guilt for the establishment of a false record for the purpose of concealing a corrupt arrangement.

Notwithstanding the gravity of the offenses involved herein, it appears that respondents have been able to produce evidence of good character and reputation and of exemplary

professional standing and conduct before the bar which is deserving of our most careful and thoughtful consideration. Judges of courts of record, attorneys at the bar, and laymen from various walks of life have testified with unquestionable sincerity as to the good name and good standing of each of the respondents in the communities in which they live and practice law, both prior to the transaction involved herein and subsequent thereto. A consideration of this testimony and the class and character of those who testified prompted the Board of Governors to include in their report the following finding of fact:

"We find that none of the respondents has ever had any charges of professional misconduct filed against him other than those under consideration; that except for the instant accusation, and except for their conviction in 1927 in the federal court on an indictment based on the facts upon which the charges now before this board are founded, all these men have borne an excellent reputation professionally, civically, and otherwise, and have been held high in esteem by their fellow citizens and by all others with whom they have come in contact. This is shown by the large number of prominent lawyers, judges and business men who have borne testimony thereto in this hearing. The respondents have been leading men in their communities and except for the trouble growing out of the Exie Jackson matter, have led exemplary lives."

In connection with the disbarment of attorneys from the practice of law on account of acts of misconduct, this court has said:

"It is the generally accepted principle, however, that since the primary purpose of the disbarment proceeding is not punishment, but the protection of the courts and public, disbarment should never be decreed if any discipline less severe would accomplish the desired result, as when there are prospects that the attorney's conduct and character may have undergone reformation. * * *

"This is not a proceeding by way of punishment, though the deprivation of the privileges of an attorney may be a matter of serious importance to a practitioner. It is a measure necessary to the protection of the public, who have a right to expect that courts will be vigilant in withholding, and if already given, withdrawing, their certificates of qualification and character, upon which the public rely." State ex rel, v. Ledbetter, 127 Okla. 85, 260 P. 454.

It is noted that the allegations of the accusation are that respondents have lost their professional standing and ceased to possess good moral characters and are unfit, unsafe, and untrustworthy persons to be entrusted with the powers, duties, and responsibilities of attorneys at law. The finding of the Board of Governors as to the character and conduct of respondents and the testimony of reputable witnesses as to the attitude of the public toward them and the conclusion of the Board of Governors, which is amply justified by the record, lead us to the conclusion that public necessity does not require the disbarment of any of the respondents.

The misconduct with which they are charged relates entirely to one lawsuit. We do not hesitate to say that for a time respondents became unmindful of the duties and responsibilities cast upon them as members of the bar, and committed acts which would bring reproach and disrepute upon the bar. Their acts cannot be condoned nor excused, but their exemplary lives and conduct prior to and subsequent to that time when they yielded to temptation and, prompted by human avarice and greed, indulged in such acts and conduct, justify this court in withholding the severest penalty. We must say that the ultimate object sought to be accomplished in these proceedings, that is, the purification of the bar, would not permit that their acts and conduct should go unnoticed and unpunished.

It is urged by eminent counsel representing respondents that the punishment that they have heretofore suffered is sufficient. In this connection it is pointed out that more than ten years have elapsed since the performance of the acts which form the basis of the accusation. During this period of time respondents were haled into court and tried as common criminals and as such were convicted and subjected to the penalties of the crime; that during practically all of this time proceedings were pending against them in which either their liberties or their right to practice law was involved. In view of these facts we readily agree that persons of fine sensibilities would necessarily endure great mental anguish and suffering. For more than ten years respondents have stood in the scorching heat of pitiless publicity. Our attention is directed to the fact that some of the respondents have made full restitution of all of the funds received by them as a result of their unethical and fraudulent conduct. These considerations, of course, appeal to the court, but we must give first consideration to the welfare of the bar and of the people.

We have discussed the record in this case and made various statements which apparently apply to all of the respondents. But we wish to make a distinction between Otho Green and Harry B. Parris and the other respondents, in that they were young lawyers

associated with lawyers of great experience, they having no control over said proceedings. We do not think that they are beyond the pale of discipline, but their inexperience in practicing law, together with the influence asserted by the other older lawyers connected with this transaction, causes us to withdraw the harsh conclusions which this record justifies as to the other persons involved.

In view of the entire record in this case, we cannot say that to inflict further punishment would tend toward the purification of the bar. Excessive punishment against any individual would not have that wholesome and salutary effect. We conclude that it would serve no useful purpose, under the record of professional respect and integrity, both before and after this isolated indiscretion, to deprive these attorneys of the right to continue to practice their profession. But for the showing of exemplary character and conduct in other respects, we think their acts warrant the extreme degradation of disbarment. Such penalty would on'y add to the pecuniary loss which these attorneys have no doubt already sustained.

In view of the previous good character of these parties, and the excellent showing of esteem by people of substantial standing, including citizens representing every walk of life, and the bench and fellow members of the bar, and the respect in which they are held in their various communities, we are exercising the utmost of consideration to them by reducing the discipline herein to a reprimand.

It is therefore ordered that petitioners, and each of them, be reprimanded in lieu of the recommendations of the Board of Governors of the State Bar.

BAYLESS, BUSBY, PHELPS, and CORN, JJ., concur. GIBSON, J., concurs in conclusion. McNEILL, C. J., concurs in reasoning and conclusions, but dissents as to result in so far as it affects T. A. Chandler and Hazen Green. RILEY and WELCH JJ., dissent.